NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|   |   |   |
|---|---|---|
| THE PRUDENTIAL INSURANCE COMPANY OF AMERICA, : : : : | | |
| Plaintiff, : : | Civil No. 7-4113 (AET) | |
| v. : : | **MEMORANDUM & ORDER** | |
| KATHLEEN GIACOBBE, ROBERT F. GIACOBBE, ROBERT A. GIACOBBE, AND LINDA GIACOBBE : : : : | | |
| Defendant. : | | |

THOMPSON, J.

This matter is before the Court upon Defendant Robert A. Giacobbe's Motion for Partial Summary Judgment [54] on Count III of Defendant Linda Giacobbe's Crosscomplaint, Defendant Linda Giacobbe's Motion for Partial Summary Judgment [59] on Count V of her Crosscomplaint, and Defendant Robert A. Giacobbe's Cross Motion for Partial Summary Judgment [64] on Count V of Linda Giacobbe's Crosscomplaint. The Court has decided these Motions based upon the submissions of both parties and without oral argument pursuant to Fed. R. Civ. P. 78. For the reasons set forth below, Robert A. Giacobbe's Motions for Partial Summary Judgment [54, 64] are denied and Linda A. Giacobee's Motion for Partial Summary Judgment [59] is granted.

**A.   Background**

Prudential Insurance Co. of America ("Prudential") initiated this interpleader action against Kathleen, Robert F., Robert A., and Linda Giacobbe on August 27, 2008. The purpose of

the interpleader action was to determine the proper beneficiary of two life insurance policies taken out by Richard Giacobbe ("Decedent").  (Interpleader Compl. ¶ 22-24 [1])  Kathleen Giacobbe is the mother of the Decedent.  (Compl. ¶ 2 [1])  Robert F. Giacobbe is the father of the Decedent.  (Compl. ¶ 3 [1])  Robert A. Giacobbe is Decedent's brother.  (Compl. ¶ 3 [1])  Linda Giacobbe married Decedent on July 12, 1986, and remained married to him at the time of his death. (Cert. of Linda Giacobbe ¶ 2 [58-29])

Decedent worked for employee of Prudential as an insurance agent for approximately twenty-six years.  As an employee of Prudential, Decedent participated in a group life insurance benefits plan ("the Plan").  (Compl. ¶ 8-9 [1])  At the time of his death, Decedent held a basic group life insurance policy for $300,000 and a group universal life insurance policy for $451,000.  (Compl. ¶ 14 [1])  It is undisputed that the Plan is governed by the Employee Retirement Income and Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, et seq.  On July 8, 1986, Decedent designated Linda Giacobbe as the primary beneficiary of both group life insurance policies.  (Compl. ¶ 10 [1])

Decedent was diagnosed with terminal anaplastic thyroid cancer on March 7, 2006. (Opp. to Mot. for Summ. J. on Count III, Ex. E [58-28]; Opp. on Count III, Ex. H [58-8])  On March 6, 2007, Prudential received a change of beneficiary form naming Kathleen, Robert F., and Robert A. Giacobbe as the new primary beneficiaries.  (Compl. ¶ 11 [1])  On March 21, 2007, Prudential notified Decedent by letter that the change in beneficiary form was missing necessary social security numbers and could not be processed.  (Compl. ¶ 12 [1])  Decedent passed away on March 22, 2007, without having responded to Prudential's letter.  (Compl. ¶ 13 [1])

Linda Giacobbe sent a letter contesting the payment of the insurance policies on April 10, 2007.  (Compl., Ex. G, [1-4])  On April 19, 2007, Prudential informed Defendants by letter that they may be entitled to certain benefits under the Plan.  (Compl., Ex. H [1-4])  After Prudential initiated this interpleader action, Linda Giacobbe filed a Crosscomplaint [34] against Kathleen, Robert F. and Robert A. Giacobbe ("Defendants") alleging that she was entitled to all proceeds from the group policies due to incapacity, mistake, undue influence, and failure to follow proper procedure to change the beneficiary in violation of ERISA.

On June 23, 2009, Robert A. Giacobbe submitted a Motion for Partial Summary Judgment [54] on Count III of Linda Giacobbe's Crosscomplaint, arguing that the evidence shows that Decedent exercised his own will when he decided to change the beneficiary on the life insurance policies.  Linda Giacobbe subsequently filed a Motion for Partial Summary Judgment [59] on Count V of her Crosscomplaint, contending that she was the proper beneficiary under ERISA because: 1) Prudential rejected Decedent's attempt to change the beneficiary for failure to follow Plan procedures, and 2) the life insurance policies were pension plans, which require spousal consent to change the beneficiary.  Robert A. Giacobbe responded by filing a Cross Motion for Partial Summary Judgment [64] on Count V of Linda Giacobbe's Crosscomplaint, arguing that Decedent's actions substantially complied with the Plan's requirements for a change in beneficiary and that the life insurance policies were welfare plans which do not require spousal consent for a change of beneficiary.

**B.     Analysis**

Summary judgment is appropriate if, on the record, "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law."  Fed. R. Civ.

P. 56(c); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).  In deciding whether summary judgment should be granted, the Court considers the facts drawn from the "pleadings, the discovery and disclosure materials on file, and any affidavits" and must "view the inferences to be drawn from the underlying facts in the light most favorable to the party opposing the motion." Fed. R. Civ. P. 56©; <u>Curley v. Klem</u>, 298 F.3d 271, 276-77 (3d Cir. 2002) (internal quotations omitted).  To survive a motion for summary judgment, there must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986).  The party that will bear the burden of proof at trial "must make a showing sufficient to establish the existence of an element essential to that party's case." <u>Celotex</u>, 477 U.S. at 322.

    1.    **Motion for Partial Summary Judgment on Count III - Undue Influence**

        A.    <u>Legal Standard</u>

Count III of Linda Giacobbe's Crosscomplaint [34] makes a claim on the basis of New Jersey's common law doctrine of undue influence.  In New Jersey, undue influence has been defined as "mental, moral or physical" exertion which has destroyed a person's "free agency" and prevented him or her "from following the dictates of [his or her] own mind and will and accepting instead the domination and influence of another."  <u>In re Niles</u>, 176 N.J. 282, 299 (2003) (quoting <u>In re Estate of Neuman</u>, 32 A.2d 826, 827 (N.J. 1943)).  Motive and opportunity to exercise undue influence are not sufficient to invalidate a testament unless it is also shown that the opportunity was taken and that the judgment and will of the testator were overcome.  <u>In re Hale's Will</u>, 21 N.J. 284, 288 (1956).

    The burden of proving undue influence lies upon the contestant.  <u>See</u>  <u>In re Estate of</u>

Celso, 2007 WL 4105277, at *4 (N.J. App. Div. Nov. 20, 2007).  The burden of proof shifts, however, if there was a confidential relationship between the testator and the person alleged to have asserted undue influence, as well as suspicious circumstances which require explanation. Haynes v. First Nat'l State Bank, 87 N.J. 163, 176-77 (1981).  The existence of both of these factors creates a presumption of undue influence which must be disproved by a preponderance of the evidence.  Id.

The term "confidential relationship" encompasses "all relationships . . . in which confidence is naturally inspired, or, in fact, reasonably exists."  Pascale v. Pascale, 113 N.J. 20, 34 (1988).  A central factor in this determination is whether the parties were dealing on terms of equality.  Estate of Ostlund v. Ostlund, 391 N.J. Super. 390, 402 (App. Div. 2007); Stroming v. Stroming, 12 N.J. Super. 217, 224 (App. Div. 1951) ("the circumstances [must] make it certain that the parties do not deal on equal terms").  Inequality may be found where one side exerted over-mastering influence, or the other side is weak or dependent.  Ostlund, 391 N.J. Super. at 402.

Once it is established that a confidential relationship exists, the suspicious circumstances present need only be "slight."  Haynes, 87 N.J. at 176.  A drastic shift of testamentary dispositions benefitting the person in the confidential relationship may be sufficient to constitute slight suspicious circumstances.  See id. at 177.

      B.    Confidential Relationship

Linda Giacobbe asserts that the natural relationship of trust between parents and child supports a finding that Decedent was in a confidential relationship with Defendants.  (Opp. on Count III 5 [58])  New Jersey courts have frequently found confidential relationships to exist

between family members. See, e.g., In re Estate of Fox, 2005 WL 3158016, at *2 (N.J. App. Div. Nov. 29, 2005) (confidential relationship between mother and son); Dessel v. Dessel, 122 N.J. Super. 119, 123 (App. Div. 1972) (confidential relationship between brothers).  Mere existence of a family relationship, however, is insufficient without an additional showing of inequality between the parties.  Ostlund, 391 N.J. Super. at 403.  Even when the relationship is between family members, proving a confidential relationship requires a showing that the decedent or testator was in "a state of dependency and reliance," such as receiving assistance with important life and financial decisions.  In re Weeks' Estate, 29 N.J. Super. 533, 535 (App. Div. 1954); see Estate of Fox, 2005 WL 3158016 at *2 (son assisted mother with business operations, financial investments, and leasing property).

According to Linda Giacobbe, by March 2007 Decedent "very vulnerable and weak," "depressed," "heavily medicated and sedated for extreme pain."[1] (Cert. of Linda Giacobbe ¶¶ 13, 16, 35 [58-29])  As early as March 2006, Decedent had been told that his chances for recovery were slim.  (Cert. of Linda Giacobbe, Ex. H [58-8])  As his condition worsened, Decedent allegedly grew more depressed and more agitated.  (Cert. of Linda Giacobbe ¶ 20 [58-29])  Dennis Cassidy, Decedent's colleague, testified that in the last six months of his life Decedent began to ask for more help at work.  In particular, he testified that despite Decedent's

---

[1] Linda Giacobbe has submitted Decedent's medical records and repeatedly refers to Decedent's weakened physical state. However, for a confidential relationship to exist, the dominance and "'dependence must be upon the mind', rather than the physical." Ostlund, 391 N.J. Super. at 402 (quoting Stroming, 12 N.J. Super. at 224).  Thus, the Court will not consider evidence of Decedent's physical weakness unless it relates to his alleged mental reliance on Defendants.
    The Court will also disregard Linda Giacobbe's references to events that occurred subsequent to March 6, 2007, as at that point the change in beneficiary form had already been filled out and submitted.

many years of experience, he began asking questions about what forms were necessary for some of his insurance transactions. (Cassidy Dep. 21:10-22:6 [66-4])  Finally, an expert in forensic psychiatry opined that "within a reasonable degree of medical probability . . . Richard Giacobbe's state of mind, in March 2007, was cognitively compromised, and rendered him incompetent to plan and carry out the change of beneficiary, and rendered him . . . vulnerable to undue influence." (Expert Report of Alberto M. Goldwaser 8 [58-19])

Evidence has also been presented showing that Decedent may have been reliant on Defendants.  Decedent spent a significant amount of time with his brother, including going to family dinners and on fishing trips.  (Robert A. Giacobbe Dep., 34:11-35:12, 37:19-37:24 [58-3])  Decedent relied on his brother to drive him to some of his doctors' appointments and research possible treatments on the internet.  (Linda Giacobbe Dep. 34:16-34:22 [58-4]).  Linda Giacobbe further alleges that, in a real estate transaction that closed in February 2007, Decedent was manipulated by his brother into keeping her off the deed yet giving her full responsibility for the mortgage.  (Cert. of Linda Giacobbe ¶¶ 8-15 [58-29])  That transaction closed on February 3, 2007, approximately six months prior to Decedent's death.  (Cert. of Linda Giacobbe ¶ 8 [58-29])

Besides frequently eating at his parents' home, Linda Giacobbe alleges that Decedent received assistance from his father when he purchased a condominium in Lavalette, NJ.  (Linda Giacobbe Dep. 32:19-32:24 [58-4])  In addition, Decedent's father testified that the change of beneficiary form "looks like a form we filled out," allowing an inference that he was involved in the decision to change beneficiaries.[2]  (Robert F. Giacobbe Dep. 41:15-41:16 [58-5])

---

[2] The Court notes that in responding to the next several questions, Robert F. Giacobbe states that he is not sure if he had ever seen the form before and that he had not seen Decedent

Considering all the facts in the light most favorable to the non-moving party, Linda Giacobbe, the Court feels that there is a material question of fact as to the existence of a confidential relationship between Decedent and Defendants.  A reasonably jury could find that Decedent was in a natural relationship of trust with Defendants, was in a physically and mentally weakened state, had become reliant on Defendants, and was susceptible to their influence.

### C.    Suspicious Circumstances

Assuming that a confidential relationship exists, there must also be at least "slight" suspicious circumstances.  Haynes, 87 N.J. at 176.  Several facts presented would support a finding of suspicious circumstances.  First, the change in beneficiaries would result in a drastic shift of the testamentary dispositions of Decedent's estate in favor of Defendants, the individuals with whom he allegedly had a confidential relationship.  Second, Robert F. Giacobbe stated that "we" filled out the change in beneficiary form, suggesting that he was involved in a self-interested transaction.  (Robert F. Giacobbe Dep. 41:15-41:16 [58-5])  Third, Decedent's failure to properly complete the change of beneficiary form could be considered suspicious given his twenty-six years of experience as a Prudential insurance salesman.[3]  Combined, these facts are sufficient to constitute suspicious circumstances.[4]  Thus, there is at least a genuine issue of

---

fill out the form.  (Robert F. Giacobbe Dep. 41:20-42:10 [58-5])  However, for this analysis, the Court must view all of the facts in the light most favorable to the non-moving party.

[3]Robert A. Giacobbe counters that it is not suspicious that Decedent did not know his family member's social security numbers.  (Reply on Count III 9 [60])  However, it may reasonably be inferred that Decedent would have known from his long employment at Prudential that he should have asked for the social security numbers in order to complete the form, even if he did not know them offhand.

[4]Linda Giacobbe also contends that the February 2007 real estate transaction is evidence of suspicious circumstances and Robert A. Giacobbe's inclination to defraud her.  (Opp. on Count III 13 [58]) Although the facts surrounding the real estate transaction may be relevant to show Decedent's reliance on Defendants, the Court does not believe that it is relevant on the issue of suspicious circumstances as the transaction did not involve Decedent's life insurance

material fact as to whether Linda Giacobbe has presented sufficient evidence to raise a presumption of undue influence.

### D. Evidence of Decedent's Independent Will

Robert A. Giacobbe contends that even if the presumption of undue influence is raised, there is sufficient evidence that Decedent exercised his own independent will that summary judgment should be granted on Count III of the Crosscomplaint. (Mot. on Count III 3 [54]) First, Defendants deny that Decedent had become mentally impaired or that he was reliant on them at the time he filled out the change in beneficiary form. According to Robert A. Giacobbe, Decedent continued to drive, work, and live alone, without reliance on Defendants, up until the day of his death. (Mot on Count III, Ex. G, No. 11 [54-10]) Linda Giacobbe does not dispute that Decedent continued to work for Prudential until the time of his death, or that he rented an apartment for himself in Lavalette, NJ, eight months after he was diagnosed. (Cert. of Linda Giacobbe ¶ 16 [58-29]) In fact, she alleges that Decedent made the decision to live part of the time along in Lavalette, NJ and part of the time with her in Toms River, NJ during the last months of his life. (Cert. of Linda Giacobbe ¶ 17 [58-29]) In addition, Decedent's doctors considered him sufficiently mentally competent to sign his medical consent forms, including those required during his last admittance to the hospital. (Reply, Ex. A [60])

Second, Defendants assert that Decedent was not influenced by them when he made the decision to change his beneficiary. Both Robert A. and Robert F. Giacobbe testified that they had not seen the change in beneficiary form prior to its completion and never discussed estate planning or insurance with Decedent. (Mot. on Count III, Ex. 6, No. 14-15 [54-10]; Robert A.

---

policies.

Giacobbe Dep. 52:6-52:15 [58-3]; Robert F. Giacobbe Dep. 42:2-42:13 [64])  Indeed, the one time Decedent's colleague asked Decedent about his personal finances, his response was "fuck them, let them fight over it."  (Cassidy Dep. 27:15-28:1 [66-4])  Further, Defendants suggest that Decedent had good reason to change his life insurance beneficiary, as he had moved out of the house where he lived with Linda Giacobbe and they had become estranged.  (Mot. on Count III 7-8 [54-3])

Linda Giacobbe disputes the fact that she and Decedent had become estranged, arguing that they were still living together part time and that he had left their house in Toms River, NJ only because being there depressed him as it reminded him of his prior healthy life.  (Cert of Linda Giacobbe ¶¶ 16, 29 [58-29])  In addition, she alleges that Decedent chose to make his parents the beneficiaries of his private life insurance policies when he was first diagnosed, but never discussed switching the beneficiary of his group life insurance policies and always promised that she would be taken care of.  (Cert of Linda Giacobbe ¶¶ 3-4 [58-29])

Given the conflicting evidence on Decedent's state of mind and motivation, the Court cannot find as a matter of law that there was no undue influence.  Thus, the Court will deny Defendants' Motion for Partial Summary Judgment on Count III of Linda Giacobbe's Crosscomplaint.

      2.    **Motion for Summary Judgment on Count V - Violation of ERISA**

          A.    <u>Characterization of Life Insurance Benefits</u>

Defendant Linda Giacobbe argues that Decedent's attempt to change the beneficiary of his group life insurance plans is ineffective because the Plan is a pension benefit plan, and under ERISA, holders of pension plans are required to obtain spousal consent to change the beneficiary

-10-

of the plan to someone other than their spouse. (Mot for Summ. J. on Count V 5-6 [59]) It is undisputed that Decedent did not obtain spousal consent before submitting the change in beneficiary form. In contrast, if the Plan is a welfare benefit plan, no spousal consent is required before a change of beneficiary. See 29 U.S.C. § 1055(c)(2). Thus, the determination of whether Decedent's failure to obtain spousal consent was a violation of ERISA turns on whether the Plan is a pension benefit plan or a welfare benefit plan.

Where the terms of a plan are clear and undisputed, the Court may determine their meaning as a matter of law. In re Lucent Death Benefits ERISA Litig., 541 F.3d 250, 254 -255 (3d Cir. 2008). The Court must look to the ERISA statute and the Plan documents to interpret Plan obligations. Id.

An "employee pension benefit plan" is statutorily defined as:

> [A]ny plan, fund or program which was heretofore or is hereafter established or maintained by an employer, or by an employee organization or by both, to the extent that by its express terms or as a result of surrounding circumstances such plan, fund or program--
> (I) *provides retirement income* to employees, or
> (ii) results in a deferral of income by employees for periods extending to the termination of covered employment or beyond. 29 U.S.C. § 1002 (2)(A) (emphasis added).

An "employee welfare benefit plan" is defined as:

> [A]ny plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits, *or benefits in the event of sickness, accident, disability, death or unemployment*, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services . . . . 29 U.S.C. § 1002(1) (emphasis added).

The primary difference between a pension benefit plan and a welfare benefit plan is the

type of benefit furnished—a pension plan provides retirement income, whereas a welfare plan provides benefits after the occurrence of a specific contingency. Colarusso v. Transcapital Fiscal Systems, Inc., 227 F. Supp. 2d 243, 251 (D.N.J. 2002). To qualify as a pension benefit plan, the plan must provide primarily for retirement benefits. 2 Ronald J. Cooke, ERISA Practice and Procedure § 4 (2009); see Oatway v. American Intern. Group, Inc., 325 F.3d 184, 188-89 (3d Cir. 2003) ("AIG plan was [] not an employee pension benefit plan under ERISA because it was not created for the purpose of providing retirement income").

      Here, Decedent purchased a basic group life insurance policy and a group universal life insurance policy. Defendant Linda Giacobbe argues that the Plan is a pension benefit plan because the group universal life insurance includes a cash element which would have been available to Decedent post-retirement.[5] (Mot. on Count V 5 [59]) Linda Giacobbe asserts that the availability of this cash element post-retirement constitutes a retirement benefit which qualifies the Plan as a pension benefit plan. The Court disagrees.

      The Plan's primary purpose was not to provide retirement benefits. Linda Giacobbe does not allege that the cash element's availability was limited to post-retirement. See In re Lucent Death Benefits, 541 F.3d at 255 (one factor in determining that plan was not a pension benefit plan was that it did not commence at normal retirement age). Nor does she allege that there is an annual benefit that would appear to be a provision for retirement income or that the cash element

---

[5] The Court notes that much of Linda Giacobbe's brief relies upon the expert report of Mitchell Langbert. Pursuant to the Order [69] entered October 21, 2009, the Langbert Expert Report was stricken as evidence because it was based on inappropriate legal conclusions. Linda Giacobbe cites only to the Langbert Expert Report to support her contention that there is a cash element. Thus, summary judgment on this issue could be granted on the grounds that Linda Giacobbe has not presented any evidence that the Plan is a pension benefit plan. However, even assuming the existence of a post-retirement cash element, the Court finds that the Plan is a welfare benefit plan as a matter of law.

involves any deferral of income.  Id.

Rather, the description of the basic group life insurance states that "a benefit is payable under this Coverage if you die from any cause."  (Compl., Ex. A, 5 [1])  Further, the other types of coverage provided under the Plan are available either upon death or disablement.  (Compl., Ex. A, 7, 9-10 [1])  Thus, the Plan can best be characterized as one that provides benefits "upon the occurrence of [a] specified contingency."  Colarusso, 227 F. Supp. 2d at 251.  Specifically, the life insurance policies in question are part of a welfare benefit plan which provides "benefits in the event of . . . death."  29 U.S.C. § 1002(1).  The incidental provision of a cash element does not change the nature or primary purpose of a benefit plan.  See Oatway, 325 F.3d at 189 (incidental provision of post-retirement benefits did not make incentive plan an ERISA pension benefit plan); In re Lucent Death, 541 F.3d at 255 ("the fact that a welfare benefit appears in a larger plan that also provides pension benefits does not change the character of that welfare benefit")  Because the Plan is a welfare benefit plan, Decedent was not required to obtain spousal consent to change the beneficiary, and thus there was no violation of ERISA due to his failure to do so.[6]

        B.      <u>Substantial Compliance with the Plan's Requirements</u>

The ERISA statute requires that plans are to be administered "in accordance with the documents and instruments governing the plan."  29 U.S.C. 1104(a)(1)(D).  Employers are allowed to establish their own standard procedures to administer a plan under ERISA, with the plain language of a plan governing.  Kennedy v. Plan Administrator for Dupont, 129 S.Ct. 865

---

[6]Note that the terms of the Plan are in accord with this finding.  The Plan documents state that "[y]ou may change the Beneficiary at any time without the consent of the present Beneficiary."  (Compl., Ex. A, 40 [1])

(2009). In the Plan's documents, Prudential reserved "the sole discretion to interpret the terms of the Group Contract, to make factual findings, and to determine eligibility benefits." (Compl., Ex. A, "ERISA Statement" [1-3]) The Plan defines "beneficiary" as "a person chosen, on a form approved by Prudential, to receive the insurance benefits." (Compl., Ex. A, 40 [1]) Failure to administer the plan in accordance with these "beneficiary rules" would be a violation of ERISA.

Defendants contend that they are entitled to the proceeds of the life insurance policies because Decedent substantially complied with the Plan's requirements for a change in beneficiary. (Cross Mot. on Count V 12-13 [64]) New Jersey state law governs the issue of substantial compliance.[7] See Kubichek, 83 Fed. Appx. at 428-29. In New Jersey, a designated beneficiary of a life insurance policy has a vested property interest that can only be divested by a properly executed change in beneficiary. Czoch v. Freeman, 317 N.J. Super. 273, 284 (App. Div. 1999). This general rule may be modified if the insured has "substantially complied" with the process required for a change of beneficiary. Id. Substantial compliance requires the insured to have made "every reasonable effort to effect a change of beneficiary." Haynes v. Metropolitan Life Ins. Co., 166 N.J. Super. 308, 314 (App. Div. 1979).

Decedent completed the change of beneficiary form and sent it to Prudential. However,

---

[7] The Court notes that there is an outstanding Circuit split as to whether state law on the issue of substantial compliance has been preempted by ERISA. The Ninth and Tenth Circuits have found that ERISA does not preempt state law on substantial compliance. BankAmerica Pension Plan v. McMath, 206 F.3d 821, 827 (9th Cir. 2000); Peckham v. Gem. State Mut. of Utah, 964 F.2d 1043, 1052 (10th Cir. 1992). In contrast, the Fourth Sixth, and Seventh Circuits have found that ERISA does preempt state law on this issue. Unicare Life & Health Ins. Co. v. Craig, 157 Fed. Appx. 787, 790 (6th Cir. 2005); Melton v. Melton, 324 F.3d 941, 945 (7th Cir. 2003); Phoenix Mutual Life Ins. Co. v. Adams, 30 F.3d 554, 560 (4th Cir. 1994). The Third Circuit has not directly addressed this issue. However, in Metropolitan Life Insurance Co. v. Kubichek, the Third Circuit applied New Jersey state law on substantial compliance to an insurance plan regulated by ERISA. 83 Fed. Appx. 425, 428-29 (3d Cir. 2003) Thus, this Court will similarly presume that state law applies on the issue of substantial compliance.

Decedent did not include the social security numbers of his new beneficiaries on the change of beneficiary form as required, and therefore the form was rejected by Prudential. (Compl., Ex. D [1-4]) These facts are not in dispute. Defendants contend that the incomplete form substantially complied with Prudential's requirements as it contained all of the other required information and clearly manifested Decedent's intent to change the beneficiary. (Cross Mot. on Count V 14 [64]) Linda Giacobbe denies that Decedent substantially complied with Prudential's requirements based on Prudential's rejection of the beneficiary form. (Opp. to Cross Mot. 1 [67])

The doctrine of substantial compliance has been narrowly construed in New Jersey. See Kaplan v. Metropolitan Life Ins. Co., 29 A.2d 143, 144 (N.J. 1942) (no substantial compliance when insured committed suicide before sending in completed forms); Prudential Ins. Co. of America v. Swanson, 162 A. 597, 600 (N.J. 1932) (no substantial compliance when insured failed to ask estranged wife for policies to submit along with completed forms). Substantial compliance is generally found only when the error was not the fault of the insured, or a binding legal document established the insured's intent to change the beneficiary. See Prudential Ins. Co. v. Prashker, 201 N.J. Super. 553, 557 (App. Div. 1985) (upholding divorce judgment that designated new beneficiary); Haynes, 166 N.J. Super. at 313-15 (finding substantial compliance when insured had correctly completed process except that he had been unable to obtain original policies from his estranged wife despite repeated attempts to do so).

Although the incomplete form may be a written manifestation of Decedent's intent to change the beneficiary, there is no genuine issue as to whether Decedent made all reasonable efforts to comply with the process set out by Prudential. Decedent had the opportunity and ability to fully complete the change of beneficiary form yet failed to do so. Decedent was in

frequent contact with Defendants and could have easily asked them for their social security numbers. Further, as an insurance salesman for Prudential, Decedent should have known that he would be expected to submit a completed form. See Kaplan, 29 A.2d at 144 (noting that decedent had knowledge of correct process as he was a practicing lawyer and had previously properly changed his beneficiary). Thus, as a matter of law, Decedent's actions are not sufficient for a finding of substantial compliance.

Prudential properly rejected the incomplete change of beneficiary form for failure to comply with the Plan's requirement that insured provide the necessary information regarding new beneficiaries on a completed form approved by Prudential.[8] If the attempt to change the beneficiary was now validated, it would result in a violation of ERISA's requirement that the plan be administered according to the governing documents. Therefore, the Court will grant Linda Giacobbe's Motion for Summary Judgment on Count V of her Crosscomplaint, and will deny Robert A. Giacobbe's Cross Motion on Count V of the Crosscomplaint.

---

[8] Note that the Court does not believe that Prudential's rejection of the beneficiary form would be determinative if the failure to follow the Plan's requirements was not the fault of the insured. Other courts have held that an insured substantially complied with policy provisions even though a change of beneficiary form had been rejected. See John Hancock Mutual Life Ins. Co. v. Douglass, 156 F.2d 367 (7th Cir. 1946) (finding substantial compliance even though insurance agent returned form because it was signed with initials rather than full name); Travelers Ins. Co. v. Smith, 106 Ill. App. 318, 322 (1982) (finding substantial compliance after employer rejected form for failure to have signature of second witness). In this case, Decedent received the letter from Prudential notifying him that the form was filled out incorrectly only one day prior to his death. (Compl. ¶¶ 12-13 [1]) Given the lack of opportunity for Decedent to correct the error, the Court does not feel that Prudential's rejection of the form alone would require a finding that Decedent did not make every reasonable effort to change the beneficiary.

## **CONCLUSION**

For the foregoing reasons, and for good cause shown,

IT IS on this 29th day of October, 2009,

ORDERED that Kathleen, Robert F., and Robert A. Giacobbe's Motion for Partial Summary Judgment [54] on Count III of Defendant Linda Giacobbe's Crosscomplaint [54] is DENIED, and it is

ORDERED that Defendant Linda Giacobbe's Motion for Partial Summary Judgment [59] on Count V of her Crosscomplaint is GRANTED, and it is

ORDERED that Kathleen, Robert F., and Robert A. Giacobbe's Cross Motion for Partial Summary Judgment [64] on Count V of Defendant Linda Giacobbe's Crosscomplaint is DENIED.

.

s/ Anne E. Thompson
_____
ANNE E. THOMPSON, U.S.D.J.